[Cite as *State v. Fox*, 2012-Ohio-4805.]

IN THE COURT OF APPEALS OF OHIO

FOURTH APPELLATE DISTRICT

ROSS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | Case No.    11CA3302 |
| vs. | : | |
| SCOTT A. FOX, | : | DECISION AND JUDGMENT ENTRY |
| Defendant-Appellant. | : | |

_____

APPEARANCES:

COUNSEL FOR APPELLANT:  J. Jeffrey Benson, 36 South Paint Street, Chillicothe, Ohio 45601

COUNSEL FOR APPELLEE:    Matthew S. Schmidt, Ross County Prosecuting Attorney, and Jeffrey C. Marks, Ross County Assistant
Prosecuting Attorney, 72 North Paint Street, Chillicothe, Ohio 45601

CRIMINAL CASE FROM COMMON PLEAS COURT

DATE JOURNALIZED: 10-16-12

PER CURIAM.

**{¶ 1}** This is an appeal from a Ross County Common Pleas Court judgment of conviction and sentence.    The trial court found Scott A. Fox, defendant below and appellant herein, guilty of assault, in violation of R.C. 2903.13.

**{¶ 2}** Appellant assigns the following error for review:

"THE TRIAL COURT ERRED IN OVERRULING DEFENDANT-APPELLANT,
SCOTT A. FOX'S, MOTION TO DISMISS ON GROUNDS THAT HIS DUE PROCESS
RIGHTS WERE VIOLATED WHEN THE STATE FAILED TO PRESERVE MATERIALLY
EXCULPATORY EVIDENCE OR WHEN THE STATE DESTROYED POTENTIALLY

USEFUL EVIDENCE IN BAD FAITH."

{¶ 3}     On March 31, 2011, appellant was incarcerated at the Chillicothe Correctional Institution.     Around 8:45 p.m., officers responded to a "man down alarm" in the dispensary.     When Lieutenant Norman Saunders arrived, he observed appellant in the nurse's office.     The dispensary officer informed Lieutenant Saunders that appellant refused to comply with orders.     Another officer ordered appellant to stand, at which point appellant "became very aggravated and aggressive."     Officer Robert Horton "took control" of appellant's right arm and appellant "pulled away striking [Officer Horton] in the right eye with [appellant's] right elbow."     Appellant claimed that he was dazed and confused as a result of an illness, that he does not recall hitting anyone, and that any contact that may have occurred was involuntary due to his illness.

{¶ 4}     On May 27, 2011, a Ross County Grand Jury returned an indictment that charged appellant with assault, in violation of R.C. 2903.13.     Appellant entered a not guilty plea.

{¶ 5}     Appellant subsequently filed a general discovery request.     One of the documents that the state produced contained the officers' incident reports.     Lieutenant Saunders' report stated that "the incident can be partially reviewed on Dispensary Camera 1."     Appellant then requested the state to provide him with a copy of the videotape.     The state subsequently informed appellant that the videotape had not been preserved.

{¶ 6}     On August 25, 2011, appellant filed a motion for sanctions/motion to compel.     He requested the court to either dismiss the action or to enter an order to preclude the state from admitting any evidence regarding the incident.     Appellant alternatively requested the court to order the state to comply with his request to produce a copy of the videotape.     Appellant stated that he believed that the video will show the incident and will thus prove that he is innocent.     Appellant claimed that he "was very ill and * * * that the contact with the correction officer was involuntary on his part and was due to his severe medical condition."

{¶ 7}     On October 24, 2011, the trial court held a hearing to consider the motion to dismiss.     Chillicothe

Correctional Investigator Paul Arledge explained that the dispensary contains two surveillance cameras - one "in the pill center, on the inmate entrance," and the other "on down the hallway down the corner towards the offices." Arledge stated that unless a video is preserved, the system automatically records over the tape every twenty to thirty days. Arledge explained that Ohio State Highway Patrol Trooper Sherri Wells contacted him to inquire whether a video of the incident existed. Arledge had not been provided a videotape of the incident, so he contacted Lieutenant Saunders to ask whether he knew if a videotape existed. Saunders informed Arledge that the video "didn't show anything so they didn't download it or put it on a disc." Arledge thus stated that the video was not preserved.

**{¶ 8}** Arledge further explained that his investigation was based upon his review of an informational packet. Through his examination of the relevant documents, Arledge believed that the incident occurred "in the hallway towards the, Nurse Carderas's office, around that area." He further explained, however, that he did not know exactly where the incident occurred.

**{¶ 9}** Trooper Wells testified that one of the cameras in the dispensary "covers where pills are dispensed * * * that's like a window where nurses give inmates pills. An officer stands there and a camera is on them." The other camera "covers a hallway." Like Arledge, Trooper Wells also explained that the system records over existing tapes approximately every twenty to thirty days, depending upon how full the servers are.

**{¶ 10}** Trooper Wells stated that Arledge provided her with the information regarding the assault and that it did not include a video. She explained that Lieutenant Saunders' incident report states that the "incident can be partially reviewed on dispensary camera one." She questioned that statement by asking Arledge about the video Saunders referred to in his report. Arledge advised her that he had been informed that the video "did not show anything so therefore they didn't download it to save it." She testified that she thus did not request that a video be preserved of the incident because she was informed that the video

"did not show anything for the assault itself."

{¶ 11}  Based upon her review of the incident, Trooper Wells believed that the incident occurred in the "nursing area, where they treat the inmates."    She explained that the camera Lieutenant Saunders referred to in his report as "camera one" would not have monitored the nursing area.    Instead, she stated that camera one monitors "the pill area, and entrance and exit out of that hallway."

{¶ 12}  In response to questioning regarding Lieutenant Saunders' statement that the incident could be partially viewed, Trooper Wells explained:

> "Lieutenant Saunders informed Investigator Arledge that the only part where he said partially was because it showed the inmate being brought into medical and the escort out of medical.    That was the partial viewing.    There was nothing of the assault itself which is why I never considered it evidence."

{¶ 13}  Trooper Wells stated that she spoke with appellant about the incident.    Appellant informed her that he did not remember the incident and that "he didn't intend to hit anybody."

{¶ 14}  Officer Joshua Pfeifer testified that the incident occurred in the hallway of the dispensary.    He stated that he reviewed the videotape from the dispensary on the day of the incident.    He explained that "[t]he only thing it shows is responding officers."    He saw "officers running in from the left, running in that way.    And then I'm not for sure the exact amount of time, later you see him being escorted out.    And that's all you can see."

{¶ 15}  Lieutenant Saunders stated that the video camera monitored the door to the nursing room where the incident occurred but not inside the room.    He explained that his statement that the incident was partially visible meant that "you can see all the responding officers, and you can see the responding officers escorting [appellant] out."

{¶ 16}  Lieutenant Saunders stated that he "believe[s]" that he tried to preserve the video but that he "must not have done it right."    He explained: "There's a, the way the camera is set up, you got to do these certain things to get it to save and if

you skip one step, evidently it won't save it." He explained that he did not erase the tape and he tried to preserve it.

{¶ 17} After the parties presented their evidence, appellant's counsel argued that the video would show "at least part of the responding officers entering the area and leaving the area", "how long the incident occurred", and "how long it would have taken for the officers to get in and get out with the defendant." He further argued that the video would help the defense "attack the credibility of the witnesses because some of the witnesses are saying, it's up the hallway. Some are saying, it's down the hallway. And the officer that was there was saying, it occurred in a room."

{¶ 18} The trial court disagreed with appellant's argument that the video is materially exculpatory and determined that "the undisputed testimony" shows that "the only thing that could be seen [on the video] and this testimony came from the two officers [who] viewed it, were the corrections officers running in to respond to the incident and the defendant being led out." The court therefore found that the incident would not have been visible on the videotape. The court agreed with appellant that the videotape might be potentially useful to challenge the witnesses' credibility, but the court did not find that the state acted in bad faith by failing to preserve the videotape. Additionally, the court found Investigator Arledge's testimony that the incident may have occurred in the hallway, where a video camera may have captured it, unreliable. The court observed that Arledge based his testimony upon "hearsay upon hearsay." The court thus denied appellant's motion to dismiss.

{¶ 19} Appellant subsequently entered a no contest plea, and the trial court sentenced him to serve six months imprisonment. This appeal followed.

{¶ 20} In his sole assignment of error, appellant asserts that the trial court erred by overruling his motion to dismiss the indictment. In particular, he asserts that the court should have dismissed the indictment because the state failed to preserve materially exculpatory evidence, i.e., the videotape, and thus deprived him of his due process right to a fair trial. Appellant claims that the state failed to establish that the videotape was not materially exculpatory. Appellant argues that the state had

the burden to prove that the video was not materially exculpatory because appellant requested the video, the state failed to provide it, the state actually destroyed it, and appellant could not obtain the evidence by other means. Appellant also argues that the video contained materially exculpatory evidence because it "evidenced the incident which gave rise to the criminal charge of assault." Appellant thus contends that the video "would have shown that the incident never occurred or that any such contact with the alleged victim was involuntary."

{¶ 21} In the alternative, appellant asserts that the videotape contained potentially useful evidence and that the state acted in bad faith by failing to preserve the videotape.

A

STANDARD OF REVIEW

{¶ 22} In the past, this court and others have stated that an appellate court conducts a de novo review of a trial court's decision regarding a motion to dismiss on the basis that the state failed to produce materially exculpatory evidence. E.g., State v. Whalen, 9th Dist. No. 08CA9317, 2008-Ohio-6739, ¶7; State v. Lupardus, 4th Dist. No. 08CA31, 2008-Ohio-5960, ¶8; State v. Russ, 11th Dist. No. 2007-T-0045, 2008-Ohio-1897, ¶14; State v. Sneed, 4th Dist. No. 06CA18, 2007-Ohio-853, ¶19; State v. Brown, 5th Dist. No. 2006-CA-53, 2007-Ohio-2005, ¶23; State v. Battease, 1st Dist. Nos. C-050837 & C-050838, 2006-Ohio-6617, ¶14; State v. Johnson, 8th Dist. No. 82527, 2003-Ohio-4569, ¶7. We believe, however, that the hybrid standard of review that appellate courts apply to suppression motions and motions to dismiss on the basis of a violation of a defendant's speedy trial right is the more appropriate standard of review to apply when reviewing a trial court's decision regarding a motion to dismiss on the basis that the state failed to disclose materially exculpatory evidence. See State v. Geeslin, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, ¶14 (not specifically setting forth any standard of review, but deferring to trial court's factual finding that tape erasure accidental when reviewing motion to dismiss on basis that state failed to turn over materially

exculpatory evidence); State v. Frasure, 11th Dist. No. 2007-A-0033, 2008-Ohio-1504, ¶35 (stating that standard of review regarding motion to dismiss is de novo, but further noting that reviewing court must accept trial court's factual findings and then determine whether court properly applied facts to law); Lupardus at ¶8 and ¶16 (stating that standard of review regarding motion to dismiss on the basis of the state's failure to produce exculpatory evidence is de novo, but then evaluating trial court's finding that the state did not act in bad faith under a "competent, credible" evidence standard).     See, generally, State v. Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶8 (applying mixed standard of review to suppression motion); State v. Brown, 9th Dist. No. 25206, 2010-Ohio-4863, ¶7 (applying mixed standard of review to motion to dismiss on speedy trial basis); State v. Barnes, 8th Dist. No. 90847, 2008-Ohio-5472, ¶19 (same); State v. Skinner, 4th Dist. No. 06CA2931, 2007-Ohio-6320, ¶8 (same).

**{¶ 23}** Thus, when we review a trial court's decision regarding a motion to dismiss on the basis that the state failed to produce exculpatory evidence, we defer to the trial court's factual findings as long as competent and credible evidence supports those findings.     Then, we independently review whether the trial court properly applied those facts to the law.

**{¶ 24}** In the case at bar, we do not believe that the trial court improperly applied the facts to the law.

B

MATERIALLY EXCULPATORY EVIDENCE

**{¶ 25}** A criminal defendant's due process right to a fair trial is violated when the prosecution withholds materially exculpatory evidence.     Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Geeslin at ¶7; State v. Johnston, 39 Ohio St.3d 48, 60, 529 N.E.2d 898 (1988).     Evidence is materially exculpatory "'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.     A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" Johnston, 39 Ohio St.3d 61, quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).     "The Brady test is stringent" and thus, "'[t]he mere

possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.'" State v. Jackson, 57 Ohio St.3d 29, 33, 565 N.E.2d 549 (1991), quoting United States v. Agurs, 427 U.S. 97, 109-110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Accord Arizona v. Youngblood, 488 U.S. 51, 56, 109 S.Ct. 333, 102 L.Ed.2d 2, fn. ("The possibility that [evidentiary material] could have exculpated [the defendant] if preserved or tested is not enough to satisfy the standard of constitutional materiality."); State v. Rivas, 121 Ohio St.3d 469, 2009-Ohio-1354, 905 N.E.2d 618, ¶14 (stating that speculation is not sufficient to establish that withheld evidence is material). Whether evidence is materially exculpatory is a question of law. See, e.g., Geeslin at ¶¶12-13 (not specifically setting forth standard of review but seemingly reviewing materially exculpatory question as a matter of law).

{¶ 26} Ordinarily, a defendant bears the burden to prove that withheld evidence is materially exculpatory. Rivas at ¶14; Lupardus at ¶20. Accord State v. Glunt, 10th Dist. No. 09AP-962, 2010-Ohio-3024, ¶10. When, however, a defendant specifically requests a particular piece of evidence and that evidence is subsequently lost or destroyed, the burden shifts to the state to show that the evidence was not materially exculpatory. Lupardus at ¶21; Glount at ¶10, citing Columbus v. Forest, 36 Ohio App.3d 169, 522 N.E.2d 52 (10th Dist. 1987). The burden does not shift to the state if the defendant makes only a general request for discovery. Lupardus at ¶22; Glount at ¶10. Instead, for the burden to shift to the state, the defendant must have made a specific request regarding the particular piece of evidence. Lupardus at ¶22; Glount at ¶10. Thus, when "evidence is destroyed pursuant to routine procedures before any request for it has been made, it is not the State's burden to show that the evidence was not exculpatory, but rather Defendant's burden to show that it was exculpatory." State v. Terry, 2nd Dist. No. 04CA63, 2004-Ohio-7257, ¶15.

C

POTENTIALLY USEFUL EVIDENCE

**{¶ 27}** If a defendant is unable to show that the withheld evidence is materially exculpatory, a defendant may nonetheless show a violation of his due process right to a fair trial if the prosecution withheld, in bad faith, potentially exculpatory evidence. Geeslin at ¶14. The "potentially useful" standard applies when the state has failed to preserve evidence "'of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'" Geeslin at ¶9, quoting Youngblood, 488 U.S. at 57. Thus, "[u]nless a defendant can show that the state acted in bad faith, the state's failure to preserve potentially useful evidence does not violate a defendant's due process rights." Geeslin at syllabus.

> "Bad faith implies more than bad judgment or negligence; instead, it 'imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.' Hoskins v. Aetna Life Ins. Co., 6 Ohio St.3d 272, 276, 452 N.E.2d 1315 (1983). Bad faith on the part of the police must be evaluated from the knowledge of the police regarding the exculpatory value of evidence at the time of the alleged destructive act."

State v. Dunn, 9th Dist. No. 03CA0037, 2004-Ohio-2249, ¶63 (citation omitted). Accord State v. Rice, 9th Dist. No. 26116, 2012-Ohio-2174, ¶18; State v. Boles, 2nd Dist. No. 23037, 2011-Ohio-3720, ¶21. Law enforcement officials act in bad faith when "their conduct indicate[s] that the evidence could form a basis for exonerating the defendant." Youngblood, 488 U.S. at 58. Whether conduct rises to the level of bad faith in this context ordinarily presents a question of law. See id. at 58-59 (appearing to review bad faith issue as a matter of law); Geeslin at ¶14 (concluding, seemingly as a matter of law, that accidental erasure insufficient to demonstrate bad faith).

D

EVALUATING WHETHER MISSING VIDEOTAPE FOOTAGE IS MATERIALLY EXCULPATORY OR POTENTIALLY USEFUL EVIDENCE

{¶ 28}  Many cases have addressed the issue of whether missing videotape footage constitutes materially exculpatory evidence, or, rather, merely potentially useful evidence.     In Geeslin, the court determined that missing videotape footage did not constitute materially exculpatory evidence.     In that case, the defendant was charged with driving while under the influence after the arresting officer had videotaped the traffic stop.     The officer, however, accidentally recorded over the part of the videotape that showed the defendant's driving, but the events immediately following remained on the tape.     The defendant filed a motion to dismiss the charges on the basis that the state failed to preserve materially exculpatory evidence.     The trial court granted the motion.

{¶ 29}  The Ohio Supreme Court subsequently determined that the missing videotape footage was not materially exculpatory because it would not show the defendant's guilt or innocence regarding the driving while under the influence charges.     Id. at ¶12.     Instead, the court observed that the missing footage would show the defendant's driving prior to the stop, which apparently was not at issue.     Id.     Moreover, the defendant's counsel acknowledged that he would have used the videotape to refute the officer's "stated reasons for stopping appellant" or that "the state would have used it to bolster [the officer's] testimony in that regard."     Id.     The court explained that the missing footage "would have been used only to challenge or corroborate the justification for the stop."     Id.     The court thus distinguished the case from other cases in which the defendants sought missing videotape footage that would have allowed them "to challenge the substance of the allegations against them."     Id. at ¶13 (emphasis sic).     The court explained:     "Here the missing evidence would not have been used to acquit appellant of the impaired-driving charge itself.     Rather, it would have been used only with regard to the validity of the stop that led to appellant's arrest."     Id.     The court therefore concluded that the missing footage would not have been materially exculpatory.

{¶ 30}  The court further examined whether the state acted in bad faith by failing to preserve the potentially useful

evidence.    It noted that the trial court had concluded that the officer had accidentally recorded over the tape, and it deferred to the trial court's finding.    The court thus concluded that because the officer accidentally recorded over the tape, he did not act in bad faith.    Id. at ¶14.

**{¶ 31}**  In State v. Acosta, 1st Dist. Nos. C-020767, C-020768, C-020769, C-020770, and C-020771, 2003-Ohio-6503, the court likewise determined that the defendant failed to establish that missing videotape footage was materially exculpatory. In Acosta, the defendant filed a motion to dismiss theft and child endangering charges due to the state's failure to preserve a videotape.    The defendant asserted that the state failed to preserve a surveillance videotape from a store that captured her actions and that would have exonerated her from the charges or would have "at least mitigate[d] the circumstances."    Id. at ¶3. The state did not preserve the tape because it believed that the defendant planned to enter a guilty plea.    The state thus advised the store employee that the tape would not be needed.    The store employee then reused the videotape.    The trial court granted the defendant's motion to dismiss.

**{¶ 32}**  On appeal, the court determined that the defendant failed to establish that the videotape was materially exculpatory.    The court explained:

> [The defendant] asserted that she believed that the videotape would exonerate her or 'mitigate the circumstances' of the crime, but she provided no basis for this assertion. [The defendant] and her counsel did not view the videotape. [The defendant] has failed to demonstrate that the videotape was materially exculpatory."

Id. at ¶8.

**{¶ 33}**  The court further determined that the state did not act in bad faith by failing to preserve potentially useful evidence.    The court concluded that the reuse of the tape "was nothing more than a mistake, which does not rise to the level of bad faith."    Id. at ¶11.

**{¶ 34}**  In State v. Terry, 2nd Dist. No. 04CA0063, 2004-Ohio-7257, the court determined that missing videotape

footage of a traffic stop involving a driver suspected of driving while under the influence was not materially exculpatory. The defendant asserted that the videotape would have been materially exculpatory because it would have allowed him to present exculpatory evidence that showed that he was not under the influence of alcohol. Specifically, the defendant alleged that the videotape would have shown that "he passed the horizontal gaze nystagmus test, his speech was not slurred, his eyes were not bloodshot, and he had no trouble walking." Id. at ¶12. The appellate court determined that the defendant failed to demonstrate that the videotape was materially exculpatory. The court explained:

> "[The officer] testified to the contents of the videotape, having reviewed it before preparing his police report. [The officer] testified that while the videotape captured his conversation with Defendant and his administration of the horizontal gaze nystagmus (HGN) test, it would not have depicted the condition of Defendant's eyes, including whether they were bloodshot or glassy, or Defendant's performance on the HGN test, or the odor of alcohol. Moreover, Defendant did not offer any testimony at the hearing disputing [the officer's] testimony relating to the stop and arrest of Defendant for DUI."

Id. at ¶16.

{¶ 35} The court concluded that the videotape was "[a]t best, * * * potentially useful." Id. at ¶17. The court then examined whether the defendant established that the state acted in bad faith by destroying the tape. The court observed that absent a request for the tape, it would have been erased thirty days after the incident pursuant to standard procedure. The officer admitted that he mistakenly erased the tape and explained that he usually preserves DUI tapes until after disposition. He further stated that he did not erase the videotape because he thought it might help the defendant. The court concluded that these facts do not demonstrate bad faith, "but only an honest mistake in destroying the videotape." Id. at ¶19. The court therefore rejected the defendant's due process argument.

{¶ 36} In State v. Durham, 8th Dist. No. 92681, 2010-Ohio-1416, the court held that the defendant failed to establish that a destroyed videotape was materially exculpatory. In Durham, a surveillance system captured an alleged assault involving

the defendant and officers in the police station's booking area.     Thirty days after the incident, the videotape of the incident was reused in accordance with routine procedures.     The defendant subsequently sought a dismissal of the charges due to the state's failure to preserve the videotape.     In determining that the defendant failed to establish that the videotape was materially exculpatory, the court explained:

> "In the present case, no one viewed the videotape before it was erased; therefore, [the defendant] cannot show that the evidence was materially exculpatory.     The tape may have supported [the defendant's] version of events at the jail, but like [the defendant], we are left with the inability to say that the videotape would show a clear set of facts that would either support a full dismissal or a limitation on the testimony surrounding the events."

Id. at ¶21.

{¶ 37}  The court additionally concluded that the defendant failed to show that the state acted in bad faith by failing to preserve the videotape.     The court observed that the officers testified that they did not tamper with or destroy the videotape and that they were unaware that the videotape would be reused after thirty days.     The court found "no evidence that the police acted to destroy or eradicate the footage" and thus determined that they did not act in bad faith.     Id. at ¶22.

{¶ 38}  Our review of the foregoing cases leads to the following conclusions.     For missing videotape footage to constitute materially exculpatory evidence, the defendant must present evidence that the missing footage captured the events at issue and would allow him to challenge the substance of the allegations, not merely the facts that occurred before or after the events at issue.     E.g., Geeslin at ¶13; State v. Tarleton, 7th Dist. No. 02-HA-541, 2003-Ohio-3492, ¶22 (holding that videotape did not contain materially exculpatory evidence when it did not depict the traffic accident that gave rise to criminal charges but rather showed events that happened approximately three hours after the accident).     If no one has reviewed the videotape, a defendant will generally be unable to show that the missing footage contained materially exculpatory evidence.     Durham. Moreover, to establish bad faith, a defendant must show more than an accidental erasure of the tape or that the tape was reused

in accordance with routine procedures.    Geeslin; Terry; Durham.

E

APPELLANT CANNOT SHOW EITHER THAT THE TAPE CONTAINED MATERIALLY EXCULPATORY EVIDENCE OR THAT THE STATE ACTED IN BAD FAITH

{¶ 39} In the case at bar, appellant failed to present any evidence that the tape contained materially exculpatory evidence.    Moreover, he failed to present any evidence that the state acted in bad faith.

{¶ 40} Initially, we disagree with appellant that the state bore the burden to prove that the video was not materially exculpatory.    Nearly sixty days after the incident, appellant made a general discovery request.    He then learned that a videotape may exist.    Approximately ninety days after the incident, appellant requested the state to produce the videotape. The state investigated and discovered that the tape was reused, in accordance with routine procedures, within thirty days of the incident.    At the time appellant specifically requested the videotape, the tape already had been reused.    This is not a situation in which appellant specifically requested the tape and the state then destroyed it.    Because appellant did not specifically request the videotape before the state failed to preserve it, the burden does not shift to the state.    Instead, it remains with appellant. E.g., Lupardus, supra.

{¶ 41} Appellant further asserts that the videotape is materially exculpatory because it showed the incident that occurred between him and the officers and, thus, would either prove or disprove the state's allegation.    As the trial court found, however, the evidence presented at the motion to dismiss hearing demonstrated that the videotape system did not capture the alleged assault.    We believe that competent and credible evidence supports the court's    finding.    Two eyewitnesses stated that the assault occurred in a room outside the range of the camera and that the camera thus could not have captured the incident.   The two witnesses who reviewed the videotape stated that it captured only the officers entering and exiting the room where the alleged assault occurred.    Thus, because the videotape would not show the alleged assault, it would not prove appellant's

innocence or otherwise allow him to challenge the substance of the allegations. Therefore, because no reasonable probability exists that the outcome of the proceedings would have been different if the officers had preserved the videotape, appellant cannot meet his burden to prove that the destroyed videotape footage contained materially exculpatory evidence.

{¶ 42} Additionally, we observe that during the trial court proceedings, appellant also argued that because the videotape actually showed the alleged assault the videotape was materially exculpatory. Appellant maintained that the videotape allows him to challenge the credibility of the officers' testimony.

{¶ 43} We believe that the cases appellant cites to support his argument that the tape contained materially exculpatory evidence are inapposite. State v. Benson, 152 Ohio App.3d 495, 2003-Ohio-1944, 788 N.E.2d 693 (1st Dist.); State v. Benton, 136 Ohio App.3d 801, 737 N.E.2d 1046 (6th Dist. 2000). In Benson, the defendant appealed the trial court's decision to deny his motion to dismiss the indictment for driving while under the influence and for disregarding a traffic control device. The defendant asserted that the state withheld videotape evidence of his encounter with the officer and that the videotape contained materially exculpatory evidence. He argued that the tape was materially exculpatory "because it related to the officer's roadside observations and the ultimate issue of whether [the defendant] had been driving under the influence." Id. at ¶6. The trial court determined, however, that the state did not violate the defendant's due process right to a fair trial by failing to produce the videotape recording of the officer's encounter with the defendant.

{¶ 44} On appeal, the court first determined that the state bore the burden to prove that the evidence was not materially exculpatory. The court observed that the defendant had specifically requested the videotape and that the state had failed to preserve the evidence. The court held that under these circumstances, the state bore the burden to prove that the tape was not materially exculpatory. The court then concluded that the state did not meet its burden because "it [was] possible that the tape was materially exculpatory." Id. at ¶12. The court observed that the defendant and two eyewitnesses disputed much

of the officer's testimony regarding the defendant's conduct. The court thus determined that the videotape "would have provided the only possible objective evidence of the events on the night [the defendant] was stopped." Id.

{¶ 45} The court also concluded that even if the evidence was only potentially useful, the officer acted in bad faith. The court observed that the officer initially denied that a tape existed and that he was evasive during his testimony. The officer stated that he was aware a subpoena existed for the videotape, but he did not look for it when the prosecutor asked him to do so. The officer further explained that he did not believe that the videotape would show the field sobriety tests. The appellate court determined that his conduct demonstrated bad faith.

{¶ 46} In Benton, the defendant appealed his driving while under the influence conviction after the trial court denied his motion to dismiss due to the state' failure to preserve a videotape of his traffic stop. The defendant had requested the videotape within five days of the traffic stop, yet the tape was not produced. Several months later, the arresting officer "discovered that the tape, if one ever existed, was erased and reused." Id. at 804.

{¶ 47} On appeal, the court first determined that the state bore the burden to prove that the tape was not materially exculpatory because the defendant specifically requested it and the state subsequently failed to preserve it. The court concluded that the state did not fulfill its burden. The court determined that "it is equally possible that the tape would have been exculpatory as inculpatory." Id. at 806. The court further observed that the defendant testified that he disputed the arresting officer's testimony and that the videotape "would have provided the only possible objective evidence of the events as they happened on the night that appellant was stopped." Id.

{¶ 48} In the case sub judice, unlike the situation in Benson and Benton, appellant, not the state, bears the burden to prove that the tape is materially exculpatory. Here, the state did not fail to preserve the videotape after appellant specifically requested the evidence. Instead, the tape was reused within thirty days of the incident in accordance with normal procedures.

Furthermore, in <u>Benson</u> it apparently was unclear whether the videotape actually captured the field sobriety tests. In the case at bar, however, the trial court concluded that video camera did not capture the alleged assault. Thus, in <u>Benson</u> the videotape possibly showed the defendant's sobriety or lack thereof. In the case at bar, however, there is no reasonable possibility that the tape shows the alleged assault. In <u>Benton</u>, the court apparently assumed that the videotape showed the defendant's conduct relating to his driving while under the influence conviction. In the case sub judice, however, the videotape does not show appellant's conduct relating to his assault conviction. Thus, in both <u>Benson</u> and <u>Benton</u> at least a possibility existed that the videotape would show the defendants' conduct regarding their convictions. In contrast, in the case at bar the trial court found and we have no reason to disagree, that the videotape did not document appellant's conduct regarding his assault conviction. Thus, unlike <u>Benson</u> and <u>Benton</u>, the videotape in question in the case sub judice would not have permitted appellant to challenge the substance of the allegations against him. Consequently, we disagree with appellant that <u>Benson</u> and <u>Benton</u> require us to conclude that the videotape contained materially exculpatory evidence.

{¶ 49} Consequently, because appellant failed to establish that the videotape constituted materially exculpatory evidence, he can prevail on his due process claim only if he shows that the videotape was potentially useful and that the officers destroyed it in bad faith. In <u>State v. Smith</u>, 2nd Dist. No. 20247, 2005-Ohio-1374, the court considered a similar factual situation in which the defendant was convicted of assault on a corrections officer. The defendant assaulted the officer in the booking area. The defendant sought a copy of the videotape from the camera that was located in the vicinity of the assault. When the state failed to produce it, he filed a motion to dismiss. At the motion to dismiss hearing, an officer stated that the videotape system is programmed to record over the existing tape every ten to thirty days. He explained the images can be transferred to a computer, if the need to do so is identified before the tape is reused.

{¶ 50} The defendant agreed that the camera most likely did not capture the images of the assault, but he stated that

it may have captured events leading up to the assault and may have been useful in impeaching the officers' testimony and challenging their credibility. The court determined that "[t]his argument essentially concedes that the video recording was not materially exculpatory, but only potentially exculpatory." Id. at ¶10. The court then determined that the defendant would need to show that the officers acted in bad faith. The court found that the officers did not act in bad faith:

> "From [the officer]'s testimony, it is clear that the recording was destroyed as part of the ordinary routine at the jail of reusing recording equipment and that a practice of preserving recordings of all assaults at that location would have been cumbersome and time-consuming."

Id.

{¶ 51} Similarly, in the case at bar the videotape was reused as part of the ordinary routine at the correctional facility. The officers stated that the video system reused the tape within thirty days of the incident. Moreover, Lieutenant Saunders stated that he attempted to preserve the tape, but apparently did not do so properly. Thus, its destruction was accidental and occurred in accordance with normal procedures—not in an attempt to thwart appellant's access to the videotape.

{¶ 52} Appellant nonetheless asserts that the officers acted in bad faith by determining that the tape was of no value. In support, he cites State v. Battease, 1st Dist. Nos. C-050837 and C-050838, 2006-Ohio-6617. In Battease, the state appealed the trial court's decision that granted the defendant's motion to dismiss her indictment for driving while under the influence of alcohol. On the date of the defendant's arraignment, the trial court ordered the state to preserve any videotapes relating to the charges. The defendant subsequently filed a motion to dismiss due to the state's failure to preserve the videotape of the field sobriety tests. The officer testified that he had viewed the videotape shortly after the arrest and determined that "it had no value for the prosecution of the charges." Id. at ¶7. According to the officer, the video did not capture the field sobriety tests because another police officer's cruiser obstructed the view. The officer thus did not preserve the tape but, instead, reused it.

The defendant presented a copy of the police department's regulations for preservation of videotapes, which stated:

> "tapes containing information that may be of value for case prosecution or in any criminal or civil adversarial proceeding * * * shall be maintained by the officer in a secure location for a minimum period of time (usually 30 days) to insure that they are not needed for evidence, scheduled court proceedings or other adversarial or departmental uses."

Id. at ¶10.    The officer stated that he did not believe the regulation applied because the video did not show the field sobriety tests.    The trial court noted that the officer decided to reuse the video before it ordered the state to preserve video evidence, but it found that the officer's violation of the departmental regulations constituted bad faith.

**{¶ 53}** On appeal, the appellate court affirmed and found "no error in the trial court's finding of bad faith."    The court explained:

> "When [the officer] violated the regulations and made the unilateral determination that the videotape was not necessary for subsequent court proceedings, he consciously circumvented the protections that the regulations contemplated.    To permit the arresting officer to decide what was relevant or useful to [the defendant] would be to abrogate her fundamental due-process rights."

Id. at ¶19.

**{¶ 54}** We, however, do not believe Battease requires us to disagree with the trial court's finding in the case at bar that the officers did not act in bad faith.    In Battease, the defendant presented evidence of a clear regulatory policy regarding videotape preservation.    Here, by contrast, appellant did not provide the court with a copy of any videotape preservation regulation that the Department of Correction uses.    The officers testified that they knew there was some policy in place, but not one of the officers stated precisely what the policy was.    Additionally, Lieutenant Saunders stated that he attempted to preserve the tape, but that he apparently made a mistake that left him unable to do so.    Thus, unlike the defendant in Battease, in the case sub judice the appellant has not presented evidence that the officers knowingly and intentionally violated a specific regulation, and, thus, failed to demonstrate that the state acted in bad faith.

F

CONCLUSION

**{¶ 55}** Consequently, because appellant failed to show that the video contained materially exculpatory evidence or that the state acted in bad faith by failing to preserve the evidence, appellant did not demonstrate that his due process rights were violated. Thus, the trial court did not err by overruling his motion to dismiss.

**{¶ 56}** Accordingly, based upon the foregoing reasons, we hereby overrule appellant's sole assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

Kline, J., concurring.

**{¶ 58}** I respectfully concur in judgment only. Here, I would arrive at the same result after applying a different standard of review.

**{¶ 59}** I would continue to apply a de novo standard in these situations. Although I understand the appeal of a mixed standard, I believe that it would be difficult to apply. For example, in determining whether evidence was destroyed in bad faith, how would we separate questions of law from questions of fact? Similarly, how would we determine that a piece of evidence is materially exculpatory without considering the weight of that evidence?

**{¶ 60}** Here, I would interpret *Geeslin* in the following manner: The trial court's finding provided support for the Supreme Court of Ohio's decision. But the trial court was not accorded the deference of a mixed-question-of-law-and-fact standard. That is why the trial court's finding is referenced at the *end*, and not the beginning, of the analysis in *Geeslin*. *See also State v. Powell*, --- Ohio St.3d ----, 2012-Ohio-2577, --- N.E.2d ----, ¶ 84 (referencing the trial court's finding at the end of the analysis).

**{¶ 61}** Thus, I concur in judgment only.

<u>JUDGMENT ENTRY</u>

It is ordered that the judgment be affirmed and that appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted, it is continued for a period of sixty days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of the proceedings in that court. The stay as herein continued will terminate at the expiration of the sixty day period.

The stay will also terminate if appellant fails to file a notice of appeal with the Ohio Supreme Court in the forty-five day period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to the expiration of said sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, P.J.: Concurs in Judgment & Opinion

Kline, J.: Concurs in Judgment Only with Opinion

McFarland, J.: Concurs in Judgment Only

For the Court

BY:_____

Peter B. Abele

Presiding Judge

BY:_____

Roger L. Kline, Judge

BY:_____

Matthew W. McFarland, Judge

**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.